AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

FILED

SEP – 4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Bhupinder Bhandari, | ) Case No.  **3  19  71441** |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

~~UNDER SEAL~~

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 22, 2017_____ in the county of _____San Francisco_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

~~UNDER SEAL~~

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date:  9/4/19

City and state:  _____San Francisco, California_____

_____
_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

_____
_Judge's signature_

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1.      I submit this affidavit in support of a criminal Complaint for Dr. Bhupinder BHANDARI ("BHANDARI").

2.      There is probable cause to believe BHANDARI engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.      As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.      An identified co-conspirator introduced BHANDARI as a physician willing to accept kickbacks in exchange for patient referrals.

5.      During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with BHANDARI in 2017 in which BHANDARI received kickback payments, in the form of cash, in exchange for the referral of patients.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges..

## B.  BACKGROUND OF THE LEGAL FRAMEWORK AND INVESTIGATION

6.      Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care. [2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7.      An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8.      Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.      In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the

3

UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed

patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about

---

against HHA Alpha.

this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance

### D. COMPLAINANT

14.     Dr. Bhupinder BHANDARI, is a 59 year old physician operating medical offices in Hayward and Pleasanton, CA. During the course of the investigation, BHANDARI accepted kickback payments from an FBI UCE in exchange for patient referrals.

### E. STATUTES VIOLATED

15.     **Title 42, United States Code, Section 1320a-7b(b)(1)(A),** in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.     PROBABLE CAUSE

### A. BHANDARI IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

16.      In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

17.     CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18.     BHANDARI was later introduced to UCE by a co-conspirator, Dr. Arkady MASSEN ("MASSEN"), a physician introduced into the scheme by SANTOS.

19.     On April 14, 2017, CW-1 and UCE met with a co-conspirator, MASSEN. During their recorded meeting, CW-1 and UCE explained their role in the takeover of HHA Alpha and

their willingness to pay kickbacks in exchange for patient referrals to HHA Alpha. At the end of the meeting, UCE paid MASSEN $3,000 to start their kickback arrangement.

20.    During the same meeting, MASSEN offered to introduce CW-1 and UCE to other physicians, or "hospitalists", who could "steer" patients to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| MASSEN: | And don't really have any needed intention and desire to<br>go to skill nursing facility and they need to deal with ah home base nursing care.  And if um I will discuss with my friends hospitalist and maybe they will kinda meet with you and maybe they steer... |
| CW-1: | Oh. |
| MASSEN: | ...patient you way. |
| CW-1: | Even better. |

21.    On June 19, 2017, MASSEN sent UCE a text message identifying BHANDARI as a "hospital based MD" who UCE should contact, offering for UCE to "Tell him I send you". UCE advised via text message s/he would contact BHANDARI, stating "Perfect will contact him and arrange to see you right after for both of our work [payment for the introduction to BHANDARI and payment for patient referrals]".

22.    On the same date, UCE contacted BHANDARI via text message, stating "Dr. Bhandari, my name is [UCE] and I am a business partner of Dr. Massen. I think he recently contacted you to explain my business model. Can I meet you at lunchtime on either Tuesday or Thursday of this week for a brief in person explanation of the benefits?..." to which BHANDARI responded "Sure" and "In a few days. I will alert you".

**B. BHANDARI ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS**

23.     On June 22, 2017, UCE recorded a meeting with BHANDARI at his medical office in Hayward, CA. Similar to the meeting with MASSEN, UCE explained his/her involvement in the takeover of HHA Alpha and the need to develop "special relationships". UCE explained s/he would like to start BHANDARI out with a monthly payment of $1,000 in exchange for two to three patient referrals and then slowly increase the monthly payment and number of patients referred over time. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Start out a doctor at a level about 2 to 3 patients a month… |
| BHANDARI: | Uh huh. |
| UCE: | … and then the following month we can add it up… |
| BHANDARI: | Mmhmm. |
| UCE: | and then add it up. And then maybe limit it out somewhere less than 10 so… |
| BHANDARI: | Ya. |
| UCE: | So there's nobody who's too much willing, too much referral |
| BHANDARI: | Right. |
| UCE: | Does that make sense? |
| BHANDARI: | Ya, sure |
| UCE: | Um, and as far as uh, as far as compensation, we're, we'd like to start out, um, at 1,000 for the first month and then we can add it up to 2… |
| BHANDARI: | Mmhmm. |
| UCE: | …and then to 3 [thousand dollars] … |
| BHANDARI: | Sure |

8

| | |
|---|---|
| UCE: | ...and then we'll keep it at that level. Does that sound fair? |
| BHANDARI: | Ya |
| UCE: | Ok. Do you have any doubts or concerns? |
| BHANDARI: | No. |
| UCE: | And you know where we're at as far as sending referrals? |
| BHANDARI: | Ya, ya. |

24.     At the conclusion of the meeting, UCE offered BHANDARI $1,000 cash to begin their arrangement. BHANDARI was reluctant to take the payment as BHANDARI did not have a patient referral "to trade" for the payment. BHANDARI eventually accepted the payment after UCE reassured BHANDARI other arrangements were similar and UCE trusted BHANDARI. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| BHANDARI: | Oh no no I have to trade for it, it's ok. |
| UCE: | Oh no no no we trust. |
| BHANDARI: | Ok alright. |
| UCE: | We took.  This this is the same way that we have other relationships. |
| BHANDARI: | Ok.  Alright.  Thank you. |
| UCE: | Ok thank you so much. |
| BHANDARI: | I will I will be in touch with you. |

25.     On June 26, 2017, four days after accepting payment from UCE, a Medicare patient under BHANDARI's care was referred to HHA Alpha from Washington Hospital in Hayward, CA.

26. During a second meeting on July 28, 2017 at BHANDARI's medical office in Pleasanton, CA, BHANDARI gave UCE an envelope containing $1,000 cash. BHANDARI was returning the cash paid to him during the previous meeting, stating "we want to mindful of the law. The law is kind of saying you can sell your services but you can't sell your patients".

27. During a meeting with MASSEN on November 30, 2017, MASSEN and UCE discussed the individuals MASSEN had introduced to UCE, including BHANDARI. During the meeting, MASSEN offered an explanation as to why BHANDARI worried about engaging in the scheme. MASSEN reassured UCE that he [MASSEN] had spoken to BHANDARI and suggested UCE to reach back out to BHANDARI. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | I'll try and reach out to them [other physicians introduced by MASSEN] again but we never did any business so I don't, didn't have any problem there and the only person who came and left was doctor Bhupinder so I… |
| MASSEN: | He was scared by one of his associates. Sometimes people receive news and misinterpret them |
| UCE: | Mmhmm. |
| MASSEN: | In a totally different way and they, you know, it's kind of unchartered territory. There is no rule or regulation, you do a bunch of things and you know what's going on in the country. Any day, every day, a new scandal, everyday a new regulation, everything like people did –inaudible- for so many decade and all of a sudden they blow up somebody recalls at forty years ago they had been tapped in the back and maybe misconstrued in a totally different way. |
| UCE: | Ya. |
| MASSEN: | This is a great country and you can be ruined like this |
| UCE: | No, I totally get someone, ya know, and I tell everyone if you change your mind specifically if you decide this just isn't a risk you're comfortable with I tell, please, just tell me. I don't want anyone who's, I don't want to make anyone do anything that they, where they're like every night they're sweating and they're waking up like, ah my |

> god. So, that's why I left Doctor Bhupinder alone, so if you're telling me he's in a better place, I'll go back and talk to him.
>
> MASSEN:   He's in a better place. He was totally at ease. You can reach him, ya.
>
> UCE:   Ok, perfect, thank you very much. Alright, so everything else is good?
>
> MASSEN:   So far, so good.

28.     On November 30, 2017, following the meeting with MASSEN, CW-1 and UCE recorded a meeting with BHANDARI at his office in Hayward, CA. During the meeting, BHANDARI agreed to resume his relationship with UCE and confirmed he had spoken to MASSEN prior to the meeting. Below is an excerpt of the aforementioned exchange:

> BHARDARI:   No problem, you wanted to reinitiate our working.
>
> UCE:   Ya, if…
>
> BHANDARI:   Ya, no problem with that, I'll do that.

29.     Before paying BHANDARI another kickback payment, UCE sought additional confirmation from BHANDARI that he was willing to continue the kickback arrangement with UCE. Below is an excerpt of the aforementioned exchange:

> UCE:   Ahh, so, just so I make sure because this is all going   through Doctor Massen, if there's any concern or   anything that you have…
>
> BHANDARI:   No, we're ok.
>
> UCE:   We're ok?
>
> BHANDARI:   I spoke to him [MASSEN], ya.
>
> UCE:   Ok, alright, um, so are you happy to continue…

11

| BHANDARI: | Yes. |
| UCE: | Oh ok. I have something for you. |
| BHANDARI: | Yes, sure. |

30.    At the end of the meeting, UCE paid BHANDARI another $1,000 cash for the agreement that BHANDARI would refer patients to HHA Alpha, advising he would contact CW-1 to discuss any issues that may arise with patients he referred. Below is an excerpt of the aforementioned exchange:

| UCE: | So, same thing as before, a thousand dollars. |
| BHANDARI: | Alright, thank you. |
| UCE: | I appreciate it and you, you have our group text? |
| BHANDARI: | Uhh, I think I do. |
| CW-1: | Ya, I'll just text you too and then we'll just do it on the group text |
| UCE: | But any patient issues, he's [CW-1] the one there. |
| BB: | Yes, I'll call you. |

31.    During a recorded meeting with UCE on February 22, 2018, BHANDARI acknowledged he had not sent any patient referrals to HHA Alpha in exchange for the $1,000 he received during their previous meeting on November 30, 2017, stating "I still have to give you one patient for the stuff you know…" UCE offered to pay BHANDARI another $1,000 in cash but BHANDARI refused, saying "I'd like to send you some patients". UCE understood BHANDARI's refusal of the kickback payment as BHANDARI's preference to refer a patient before accepting additional payments.

## C. BHANDARI ENGAGES IN A FALSE CLAIMS SCHEME

32.     A parallel FBI investigation into home health agencies in the San Francisco Bay Area revealed BHANDARI was likely engaged in a false claims scheme with the home health company, NEOGEN CARE, in Hayward, CA.

33.     During the course of the investigation, FBI Agents interviewed approximately 30 patients from apartment complexes targeted in similar schemes by other home health agencies in the area. From the interviews, Agents learned the beneficiaries were authorized for medically unnecessary services they never received by physicians they had never met. At least ten of the beneficiaries interviewed by Agents were billed by NEOGEN CARE for services authorized by BHANDARI.

34.     During the execution of an FBI search warrant at BHANDARI's office in Fremont, CA on March 7, 2019, Agents seized approximately 54 patient files identified as "new patients" and containing authorizations for services from NEGOEN CARE. The patient files contained no other documents, indicating the patients were not actually under BHANDARI's care and were likely recruited by a home health marketer with NEOGEN CARE.

35.     From January 1, 2012 through October 31, 2018, NEOGEN received approximately $545,239 in Medicare reimbursements for services authorized by BHANDARI.

## III.    PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

36.     Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

13

37.     Based on all of the foregoing, probable cause exists to believe that BHANDARI accepted kickback payments from UCE that were intended to induce BHANDARI to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

38.     Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by BHANDARI for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

39.     Therefore, there is probably cause to believe that patient referrals sent to HHA Alpha by BHANDARI in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV.     CONCLUSION

40.     Based on the foregoing, there is probable cause to believe BHANDARI received the payment of kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## V.     REQUEST FOR SEALING

41.     Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this ___ day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

15